## MICHAEL SULLIVAN *vs.* THORNDIKE COMPANY.

Hampden.    September 27, 1899. — December 7, 1899.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Personal Injuries — Master and Servant — Act of Superintendence — Due Care — Assumption of Risk — Evidence.*

In an action under the employers' liability act, St. 1887, c. 270, for personal injuries occasioned to the plaintiff by the fall of a freight elevator which he was employed to run in carrying material in process of manufacture from one department to another in the defendant's mill, the fall being caused by overloading the elevator with a quantity of material, the plaintiff testified, on direct examination, that A., who was the second hand in one of the rooms, told another workman to put the truck containing the material on the elevator, and then said to the plaintiff, " You take that up stairs "; that A. " gave orders to the help " ; and that no one in that room " gave orders " to A.   On re-cross-examination, he testified: " When the men were there at any time, whether they were second hands, or third hands, or common workmen, and put their load on the elevator, they used to tell where to take the load "; and that " when anybody gave what I call orders with respect to the load or weight, it was to tell where the load was to go and that was all there was of it." *Held*, that the plaintiff's testimony on re-cross-examination must be taken to be an explanation of what he meant by the word " orders " in his direct examination; and that, with this explanation, there was no evidence to warrant a finding that the direction given by A. was an act of superintendence.

It is not obvious to an ordinary man, who is not a mechanic, although he has had an experience of seven years in running such an elevator, and is familiar with its various parts, that if an elevator, which is suspended by two hemp ropes passing in grooves over a drum situated at the top of the well-hole in which it runs, and attached at one of their ends to the cross beam at the top of the ele-

vator, and at the other to two counter weights running up and down behind wooden casings in the side of the well-hole, is overloaded, the ropes will slip. in the grooves and the elevator fall; and he does not assume the risk of injury from such an accident.

At the trial of an action for personal injuries occasioned by the fall of an elevator, the cause of its fall is a proper subject for expert testimony, and the questions put to the witness in this case were competent.

TORT, for personal injuries occasioned to the plaintiff while in the employ of the defendant. At the trial in the Superior Court, before *Maynard*, J., the case was submitted to the jury on a count in the declaration under the employers' liability act, St. 1887, c. 270, alleging negligence of a superintendent, and on a count at common law, alleging failure to give the plaintiff proper and sufficient instructions and warnings in regard to the danger of his work.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions. The facts appear in the opinion.

*W. H. Brooks & W. Hamilton*, for the defendant.

*J. B. Carroll & W. H. McClintock*, for the plaintiff.

LORING, J. The plaintiff was injured by the fall of a freight elevator in the defendant's mill.

On the day of the accident he came with the elevator in question to the spinning-room, which was on the fourth floor of the new part of the mill, and found there a truck loaded with ten boxes of yarn waiting for him. He testified that one Hutchinson, the second hand in the spinning-room, told one Real, who was standing by, to put the truck on the elevator, and said to the plaintiff, " Mr. Sullivan, you take that upstairs "; Real put the truck on the elevator, and one Laplant, who it appeared was going to the room below, got on the elevator; the plaintiff pushed the shipping-rod in the proper way to start upwards; the elevator rose an inch or so and then fell very rapidly to the bottom of the well, causing the injury complained of.

The elevator was suspended by two hemp ropes; these ropes passed over a drum situated at the top of the well-hole in which the elevator ran, and were attached at one of their ends to the cross beam at the top of the elevator, at the other to two counter weights which ran up and down behind wooden casings in the side of the well-hole. The drum had on its surface two grooves in which the ropes ran; a shaft was set in the centre of the

drum, and this shaft was put in motion by two belts, one open, the other a cross belt running from the main shaft, shifting on to a tight pulley ; when the open belt was shifted on to the tight pulley the shaft ran in one direction, and when the cross belt was shifted on, it ran in the opposite direction. There is a shipping-rod through the five stories of the factory ; by moving this rod up, the open belt is thrown on the tight pulley and the elevator goes down ; by moving the rod down, the cross belt is thrown on the tight pulley and the elevator goes up. The belts when put on the tight pulley start the shaft ; the shaft starts the drum, and by the friction of the two ropes on the drum the elevator is raised or lowered.

The plaintiff had been employed by the defendant in running elevators for seven years. The plaintiff's regular elevator was in the new part of the defendant's mill, and the elevator on which the injury happened was in the old part of the mill. The plaintiff's duty in running both elevators was to carry the material in process of manufacture from one department to another department, as the different stages of manufacturing required.

The plaintiff testified that a good many times before the two days in question, when there was trouble with the elevator in the new part he had gone over and taken up the stuff he had to take up on the elevator in question in the old part, but that this had not happened very often altogether ; that the two elevators were constructed in the same way, the only difference being that the elevator he used regularly had one, in place of two, ropes running over the drum ; that he had oiled the pulleys and mechanism, and knew just what the office of the various parts was, and could see all there was to see; that he was under one Hughes, who kept his time and gave him orders ; that he was originally hired, before Hughes was employed by the defendant, by the man who then had the position which Hughes had at the time of the accident, and he continued to work under the direction of Hughes, and was so working at the time in question ; and that Hughes employed and discharged help. It is clear that Hughes was a superintendent within the employers' liability act.

On the day before the accident Hughes told the plaintiff to run the elevator in the old part, that is, the elevator in question. The plaintiff testified that he was not told by Hughes or any-

body else not to overload the elevator, nor how much of a load the elevator would carry. The other elevator had stuck when he had too much of a load on, and once the other elevator had gone down with him.

It was admitted that the accident resulted from the load on the elevator being so much heavier than the counter weights that the friction was overcome, the ropes slid in the grooves, and the elevator fell rapidly from the fourth story to the bottom of the well-hole.

1. The presiding justice was asked to rule that there was no sufficient evidence that Hutchinson was a person intrusted with and exercising superintendence over the plaintiff.

The plaintiff testified on direct examination that he was told by Hughes to run the elevator, and that he, Hughes, would provide men to load and unload; that Hutchinson was second hand in the spinning-room; that he fixed frames and looked after the help to see if they were doing their business as they ought to; " he did nothing else as I know of; he gave orders to the help; I don't know how many employees there were in the spinning-room; I should think there were about twelve or fourteen men and women to whom Hutchinson gave orders; I should think there were about twenty in the other part that he gave orders to; . . . the rest of the time he was walking round to see how the work was going and see if the help was all right; I suppose he was giving orders to some of them "; that no one in that spinning-room gave orders to Hutchinson; " Hutchinson gave me some orders; I took my orders also from the third hand, the second hand, the overseer in each room; I took orders to do what they told me, take up this yarn, to do just as they told me, carry up yarn as I would be told to "; and that he had to go by their orders.

On re-direct examination the plaintiff testified that he had taken orders from the second and third hands with reference to taking up or down material in the elevators since he went to work for the defendant. On re-cross-examination he testified: " When the men were there at any time, whether they were second hands, or third hands, or common workmen, and put their load on the elevator, they used to tell where to take the load; just the same as Hutchinson has with any of the others; any of

the people who were there in the mill and helped load the elevator would tell me where to take the load sometimes, but not all times, because I knew sometimes, but not many times ; when anybody gave what I call orders with respect to the load or weight, it was to tell where the load was to go and that was all there was of it."

Hughes testified : " If a particular load was to go to a particular place, it was customary for them to tell him where the load had to go " ; that so far as his observation went the load which the plaintiff would take up in the elevator depended on the doffs that came off the frames ; sometimes they would not all doff, and there might be a box or two or three boxes different in the load. Again : " Occasionally in a while I might get a complaint that something was wrong in the elevator ; if he was not satisfying, they would come to me ; if there was anything the matter in the weaving or spinning room ; boxes lying there that were not going up, they would come to me ; sometimes it would not work as steadily as another ; if their work was n't being done as fast as they wanted, they would tell they wanted so and so moved ; I cannot say that they would tell me that Mr. Sullivan was not doing as they wanted to have him ; I knew they were not satisfied ; I expected Mr. Sullivan to satisfy them."   Again : " I never knew Mr. Sullivan to obey any other person other than myself, any more than putting the stuff where they wanted it put."

Laplant testified : " In this room Real was the third hand ; I had often seen when the elevator came to a certain room where there was material to be taken up to some other floor, I had often seen the second hand say to the elevator man, ' You take this to a certain floor,' and he would do it."

Real testified : " I went around this day and got all the boxes that were ready to go up, and I had done the same thing before, and the elevator man had always carried them up when I had prepared the load ; that was the custom, and I never knew of an instance when he did not take up whatever load was prepared for him ; I put the load on, and Mr. Hutchinson was right there."

Hutchinson, upon cross-examination, testified that he never saw the plaintiff throw back or refuse to take up any load that was prepared for him on any floor in the building.

Both Hughes and Hutchinson testified that it was for the

plaintiff to decide how much to take on the elevator at any one time.

The presiding justice instructed the jury that if Hutchinson had the right to say to the plaintiff " 'take these goods upstairs,' and it was the duty of the man to obey that, that would be a superintendence"; but that if Hutchinson merely gave a direction pointing out where the goods were to go, it was not superintendence. The instruction given was a correct statement of the law. *Whittaker* v. *Bent*, 167 Mass. 588. But on the whole we are of opinion that the plaintiff's testimony on re-cross-examination, ending up with the statement " when anybody gave what I call orders with respect to the load or weight, it was to tell where the load was to go and that was all there was of it," must be taken to be an explanation of what he meant by the word " orders " in his direct examination, and that, with this explanation of his testimony, there was no evidence on which the jury could find that the direction given by Hutchinson, even accompanied as it was by the act of Real in putting the yarn on the elevator, was an act of superintendence directing him to take the whole load of ten boxes which it was his duty to obey, but on the contrary that it was an indication by Hutchinson where the load was to go, accompanied by the act of Real in helping to load the elevator which Hughes had promised should be done.

In construing the statement found in the bill of exceptions as to the plaintiff's testimony on re-cross-examination, it is only fair to him to assume that the expressions stated to have been used by him are not his, but are those of the defendant's counsel in framing questions on re-cross-examination to which he assented ; but he did assent to this explanation of the word " orders," and no further testimony was given by him on the point. On a fair interpretation of the whole testimony we are of opinion that the plaintiff's statement on re-cross-examination was meant to be an explanation ; and that this was not a case where the jury might find that the plaintiff used the word " orders " on direct examination as meaning acts of superintendence ordering him to take a particular load, and where this testimony on re-cross-examination was a statement in conflict with that which, under the circumstances, the jury might or might not believe.

If the jury believed the plaintiff's testimony as to the failure of Hughes to give him warning about the ability of this elevator to carry weight, it was entirely immaterial whether the direction of Hutchinson was the command of a superintendent or an indication of destination. The plaintiff's right to recover would have been made out by proof that Hughes set him to work on the elevator, which, when carrying too great a load for the counter weights, necessarily fell to the bottom of the well, without telling him so and telling him how much the elevator would carry. Under these circumstances it would have been immaterial whether the plaintiff was directed by a superintendent to carry this truck load of ten boxes of yarn to the floor above, or was told by a fellow servant that the destination of the truck load was the floor above.

But the plaintiff was to some extent contradicted by Hughes as to this, and he did not put his case on this ground; he did put his case on the ground that Hutchinson was a superintendent, that Hutchinson directed him to take the ten boxes as one load, that the direction was an act of superintendence, and that Hutchinson was negligent in directing him to take so large a load. Since the case was left to the jury on that issue, and there is no evidence on which the jury could find for the plaintiff on that issue, we feel forced to sustain this exception.

The case must go back for a new trial, and therefore we will briefly dispose of the other questions raised here which are likely to be raised again.

2. The defendant requested a ruling to the effect that there was no sufficient evidence, first, of due care by the plaintiff, and, second, that the plaintiff did not assume the risk of the injury which he sustained. The request was rightly refused. It is not obvious to a man who does not appear to be a mechanic, that in case of such an elevator as this was, the ropes would slip and the elevator would fall, if it was overloaded. It is doubtless true, as this accident showed, that if such an elevator is overloaded the ropes will slip in the grooves and the elevator will fall, and one skilled in mechanics would, or at least ought to, appreciate that result; but that result is not obvious to an ordinary man, even with the plaintiff's experience of seven years in running a similar elevator, in respect to which he testified that he knew the

office of the various parts and had seen all there was to see ; and he himself testified : " I did not know that this elevator would carry but just so much " ; " I did not know or have information from anybody how much this elevator would carry " ; " I did not know that if it was overloaded it would drop; I did not know that if I got too much of a load on it would come down." We think that the jury was justified in believing that these statements were true.

3. We are of opinion that the subject testified to by Webber was a proper subject for expert testimony, and the particular questions were competent.*          *New trial ordered.*

─────────

* These questions were as follows: " 1. Assuming that that elevator went up an inch with a certain load on it, and then fell immediately to the bottom floor with a greater degree of speed than it would go down of its natural operation, what do you say was the cause of it?   2. What do you say, whether that [the fact that the rods under the elevator floor were bent] indicates anything in reference to the action of the tappet?   3. If these irons were bent after the accident, what would that indicate as to whether they had struck the bottom of this well ?   4. What would that indicate as to the cause of that elevator not being stopped ?   5. If after the accident these braces which held the V-shaped irons underneath the floor of the elevator were bent an inch in towards the floor of the elevator and the tappet on the side of the shipping-rod was not broken or bent, assume they were not, what is the explanation of that?   6. Whether or not if the motion were given pulling down on the elevator shipping-rod and the elevator instead of going up slipped down, whether or not the elevator would go eighteen inches farther down before the tappet would perform any work than it would if the opposite direction were given, namely, the bearing up of the shipping-rod ? "